CHIEF JUSTICE LINDSAY
delivered the opinion or the court.
Section 3, article 23, chapter 29, General Statutes, provides, that “Whoever shall write, print, vend, or have in possession with intent, for himself or another, to sell or offer to sell, negotiate, exchange, or dispose of any ticket, share of a ticket, or any writing, certificate, token, or device, purporting or intended to entitle the holder, bearer, or any other person to *660 any prize, or any share of any interest in any prize to be drawn in any lottery in or out of this state, shall be fined, for every such offense, from $100 to $1,000.” ^
The appellee is charged with the offense of vending a lottery ticket. The specification, as set out in the indictment, is as follows: “The said R. M. Bull, in the said county of Jefferson, on the-day of September, A. D., 1876, and within one year before the finding of this indictment, unlawfully did vend and sell to one Jake Cook, for a certain sum of money, to-wit, for the sum of twenty-five cents, a certain ticket, purporting to be in the Kentucky State Lottery for the benefit of the University of Paducah, numbered 1519, called extra class No. 573, with certain combination numbers thereon, to-wit, Nos. 23, 39, and 72, which said ticket purported to entitle the holder thereof to one quarter of such prize as might be drawn to its numbers, if demanded within twelve months after the drawing, subject to a deduction of fifteen per cent, payable forty days after the drawing, which said ticket purported that the drawing of said lottery would take place at Covington, Ky., on Thursday, October 5, 1876, a. m.,” etc.
To this indictment a demurrer was sustained, and the prosecution having been dismissed by the court below, the Commonwealth prosecutes this appeal.
The offense of vending a lottery ticket is set out in the exact language of the statute, and it is certainly described with sufficient minuteness.
But appellee claims that the University of Paducah is not subject to the general laws prohibiting lotteries and making it unlawful - to write, print, or vend lottery tickets, and insists that because the indictment discloses the fact that the ticket sold, purported to be in the lottery drawn, or to be drawn, for benefit of that University, his license or privilege was in effect pleaded by the Commonwealth, and therefore that the demurrer was properly sustained.
*661 It is stated in the indictment that the ticket purported to be in the Kentucky State Lottery for the benefit of the University of Paducah, but there is no intimation that said University was then drawing or operating a lottery of that name, nor that the persons who assumed to draw and operate it had authority from, or were in any way whatever connected with that institution.
The courts may take judicial cognizance of the acts of the legislature under which the president and board of directors of the University of Paducah claim the privilege of raising money by way of lottery, but they can not judicially know that the Kentucky State Lottery is or was in September, 1876, being drawn by said president and directors, or by their agents, lessees, or vendees; nor can they know that said University was the beneficiary of the proposed drawing, merely because the ticket sold by the appellee stated on its face that the Kentucky State Lottery was for its benefit.
These are matters of fact left open by the indictment, and if they exist at all, are to be established as matters of defense by the appellee. If the ticket was issued by a person or corporation having legal authority to raise money by way of lottery, the appellee might sell or vend it without incurring the penalties denounced by the statute heretofore quoted, but the onus is on him to establish this ground of defense.
It was not incumbent on the Commonwealth to aver and prove that the ticket sold was not issued by or under the authority of the grantee of a subsisting lottery privilege. “ The words of the statute prohibiting the sale or vending of lottery tickets are general, and include all tickets and all lotteries. If there are exceptions or provisos, they are not contained in or embraced by the statute itself. If legal lotteries are excepted out of the operations of the general law, the exceptions are to be found in the acts containing the grants or privileges. These exceptions fall within the rule/ that *662 when a statute contains provisos and exceptions, in distinct clauses, it is not necessary to state in the indictment that the defendant does not come within the exceptions, or to negative the provisos it contains. . . . For all these are matters of defense which the prosecution need not anticipate, but which are more properly to come from the prisoner.” (1 Chitty’s Grim. Law, 283, 284; Com. v. Young, 7 B. Mon. 1; Com. v. Powell, 2 Met. 10; Com. v. Bierman, 13 Bush, 345.)
It is objected that this rule can not be applied in this case, because the indictment, in describing the ticket sold, shows that the defendant is within the exception; but we have just seen that such is not the case, even though it be conceded that there was a lottery privilege for the benefit of the University of Paducah in existence in September, 1876.
The acts relied on as establishing the grant of lottery privileges to that institution are those of February 8, 1839; March 11, 1851; January 25, 1858; February 9, 1866, and February 7,1867. The first named act authorized certain persons to raise by way of lottery $100,000, to be appropriated one fourth for the improvement of the Paducah wharf, one fourth for the benefit of the Paducah Female Seminary, and the balance for the benefit of the Paducah Male Seminary. The act of March 11, 1851, entitled "An act to incorporate the University of Paducah,” provided, that if the people of that town should vote for the acceptance of its charter, the then trustees of the male seminary should formally convey to tlie president and board of directors of the university all the real and personal property then owned by said male seminary, including •land and other property, and all rights, privileges and emoluments enjoyed by it. The only interests the university could have taken under this act, so far as the lottery privilege was concerned, was the right to receive from the original managers one half of the sum of money to be thereafter raised. The act of January 23,1858, recites that doubts had arisen whether *663 the Revised Statutes had not repealed the act of February, 1837, doubtless meaning the act of February, 1839, and then declared that the acts in relation to the seminaries of Paducah passed prior to the adoption of the Revised Statutes should be revived, re-enacted, arid continued in full force.
The act of February 9, 1866, ignores altogether the University of Paducah, and any rights its president and board of directors may have acquired under the provisions of the act of March 11, 1851, and provides, “That the trustees pf the male and female academies or seminaries of the town (now city) of Paducah, and the managers of any fund, franchise, or privilege for their benefit, or in which they are interested, shall have the power to rebuild and repair, or both, any of the houses or buildings destroyed or injured by fire, or by the armies, or otherwise. And, for that purpose, the said trustees and managers, or a majority of them-, are hereby clothed with full powers and authority to lease, sell, mortgage, or otherwise dispose of, to any person or persons, any real estate or other property, or any franchise, privilege, or fund in which said academies or seminaries have or are interested, or of which they are the beneficiaries, in part or in whole, upon such terms and conditions as they or a majority of them may deeúi to the advantage of said institutions of learning, any law to the contrary notwithstanding.”
The provisions of this act authorize the presumption that the people of Paducah did not accept the charter of the university, and that it took nothing under the act of 1851.
Its claim to the lottery privilege or franchise, if it has any, accrued to it under the provisions of the act of February 7, 1867, which provides, that the university and the trustees thereof “ shall be, and are hereby invested with all the powers, rights, property, and franchises or interests therein, that have by all former acts of the legislature been conferred upon the Male Seminary of Paducah. And all acts heretofore passed *664 for the benefit of the male and female seminaries of Paducah, and that portion of an act approved February 8, 1839, and not repealed by the act approved February 9, 1866, are hereby re-enacted for the benefit of said university, female seminary, and other purposes of said act, said male seminary having been merged, by an act of the legislature, in the University of Paducah. And the trustees of said university shall have the same power to sell or dispose of property, buildings, rights, and franchises or interests therein that the trustees of the male seminary have or had by law.”
It can not be maintained, under any reasonable construction of these acts, that the University of Paducah has the right, through its president and board of directors, or their agents, lessees, or vendees, to draw or cause to be drawn, a lottery for its own exclusive benefit. If the grant remained unexhaustedin September, 1876, a lottery might have been drawn for the-joint benefit of the university, the female seminary, and the city of Paducah, one half of the profits of the drawings, or of the proceeds of the lease or sale, to be appropriated to the university, one fourth to the female seminary, and one fourth to the Paducah wharf.
There being no statute, public or private, authorizing a. lottery to be drawn for the sole benefit of the said university, it is evident the indictment contains no statement of facts warranting the assumption that the Commonwealth has pleaded a license on the part of the accused, even if it be-conceded that the Kentucky State Lottery was operated under authority from and for the benefit of that institution. And if the Commonwealth shall prove the offense as charged, then, to escape conviction, the appellee must show either that the said lottery was controlled and managed by the managers named in the act'of 1839, or their successors, or by persons deriving authority from said managers, and the trustees of the university and the trustees of the Female Seminary of *665 Paducah, “or a majority of them.” The act of 1866 empowered said managers and trustees, or a majority of them, acting jointly, to lease, sell, mortgage, or otherwise dispose of such franchises and privileges as those seminaries were interested in, and the act of 1867 merely substituted the university and its trustees for the male seminary, and with no greater interest in the franchises or privileges in question, and no more comprehensive power of disposition of them than that theretofore enjoyed by the trustees of that seminary.
The appellee must also prove that the lottery grant or privilege had not been exhausted prior to September, 1876. The privilege of violating with impunity the provisions of a general penal statute is exceptional, and against common right, and the grant under which it is claimed will be oonstrued with strictness in favor of the public and against the favored grantee. And after a reasonable time has elapsed within which to accomplish its purposes, certainly after more than thirty-seven years, the party who seeks protection under it must come prepared to show, not only that those under whose authority he acted at one time enjoyed temporary immunity from the punishment denounced against the community in general, but that the legislative grant had not expired by its own terms, and was in force when he did or performed the act with which he stands charged.
If $100,000 had not been raised under the act of 1839 prior to September, 1876, then the beneficiaries of the grant, or their agents, lessees, or vendees had the right to issue lottery tickets, and the accused might lawfully vend them. But his exemption from punishment depends on this negative fact, and he must establish it by proof. ITe can no more ask to have its existence presumed in his favor than can any other culprit, against whom the Commonwealth has made out a prima facie case, ask to have any other matter of excuse or defense presumed in favor of his innocence..
*666 This rule imposes no hardship on the appellee. The acts of the legislature under which the lottery privilege is claimed, make no provision to enable the Commonwealth to ascertain at what time the grant has been or may be exhausted. It is a fact peculiarly within the knowledge of the parties who manage and conduct the lottery, and as the defense relies on the ground that the ticket sold was issued by parties acting under the authority of an unexhausted and subsisting lottery grant, it is but reasonable and proper that he shall be required to establish the negative fact upon which his right to immunity from punishment depends. (Greenleaf on Evidence, vol. 1, sec. 79.) For the same reason it was not necessary to aver want of authority on the part of the persons who issued the ticket sold by appellee.
From these conclusions it follows that it was not necessary to supplement the charge that the sale of the ticket was unlawful, with the further averment that such was known to be the case by the accused. When the legislature has declared that a given act shall be deemed unlawful, the person voluntarily doing said act, will be chargeable with a criminal intent, and the guilty knowledge will be presumed as matter of law. This conclusion is sustained by the case of Ulrich v. The Commonwealth (6 Bush, 400), in which it was held under a statute imposing a penalty on any person who should sell or give intoxicating liquors to a minor, without written authority from his parent or guardian, that “ It is as incumbent on the vendor of liquor to know that his customer labors under no disability as it is for him to know the law, and his ignorance of neither will excuse him.” And that case is not, as counsel seem to suppose, without precedent.
The marrying a second time, during the life of the first husband or wife, is punishable, though the former partner has voluntarily withdrawn, and remained absent and unheard of for any term of time less than the period limited by statute, *667 though the person offending honestly believes, at the time of the second marriage, that the first husband or wife is dead. (Com. v. Marsh, 7 Met. 472.) In this case it was urged for the defendant, that where there is no criminal intent there can be no guilt; and, if the former husband was honestly believed to be dead, there could be no criminal intent. But if a statute has made it criminal to do any act under particular circumstances, the party voluntarily doing that act is chargeable with the criminal intent of doing it. (Waiterman’s note to Arch-bold’s Crim. Practice and Pleading, 7 ed., vol. 2, p. 1031.)
Judgment reversed, and cause remanded, with instructions to overrule the demurrer, and for further proceedings not inconsistent with this opinion.